| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>RICHARD TOLBERT,<br><br>　　　　　　　　　Defendant. | Case No. 19-CR-236-2-JPS-JPS<br><br>**ORDER** |

**1.　　INTRODUCTION**

On June 14, 2024, Defendant Richard Tolbert ("Defendant"), proceeding pro se, moved for compassionate release. ECF No. 72. The motion both invokes extraordinary and compelling reasons and references recent amendments to the United States Sentencing Guidelines (the "Guidelines") as possible bases for reducing Defendant's sentence. *See id.* Upon consideration thereof, along with the Government's response, ECF No. 79,[1] and Defendant's reply, ECF No. 86, the Court will deny the motion.

**2.　　BACKGROUND**

In February 2020, Defendant pled guilty to three counts of Hobbs Act robbery and two counts of use of a firearm during and in furtherance of a crime of violence, ECF No. 25, which the Court accepted on March 30, 2020. ECF No. 36. Tolbert, who is now forty-one years old, was sentenced on July 8, 2021, to a term of imprisonment of fourteen years (168 months) and one

---

[1] The Government moves to seal its response and the attachments thereto, which reference and include Defendant's medical records. ECF No. 78. The Court will grant the motion and direct that the Government's submission at ECF No. 79 and its attachments be sealed until further order of the Court.

day along with three years of supervised release. ECF No. 57 at 3. This was one day more than the mandatory minimum term of imprisonment imposed by the firearm counts. ECF No. 59, ¶ 171.

The Court's judgment included a recommendation to the Bureau of Prisons ("BOP") "that the defendant be considered for incarceration at a federal facility most near the Eastern District of Wisconsin or the Northern District of Illinois," but "given the defendant's medical history," the Court suggested that "placement at a federal medical center such as that in Rochester, Minnesota may be more appropriate." ECF No. 57 at 3. Defendant is incarcerated at the Federal Correctional Complex Butner ("Butner Complex") in North Carolina. *Inmate Locator*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Dec. 3, 2024). He began in Federal Correctional Institution, Butner Medium II ("Butner II") and was subsequently transferred to Federal Medical Center Butner ("FMC Butner"), where he remains with a projected release date of October 3, 2031. *Id.*; ECF No. 72 at 3; ECF No. 79 at 7, 9; ECF No. 86 at 14.

3. **LEGAL STANDARD**

In 2018, Congress enacted the First Step Act, amending 18 U.S.C. § 3582(c)(1)(A) to allow courts to modify imprisonment terms either upon a BOP motion or "upon motion of the defendant."[2] The movant bears the

---

[2]Defendants can move for sentence modification in this way only after they have "fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf," or if thirty days have passed since their facility received such a request for release—"whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The Government concedes that Defendant satisfied the exhaustion requirement, so the Court discusses that aspect of the analysis no further. ECF No. 79 at 2–3 (noting that Defendant "petitioned the Warden at Butner FMC for a reduction in sentence" and that the "Warden denied [his] request for early release because his medical issues/needs did not fit the criteria"); *id.* at 3 n.2 ("[T]he United States will agree that [Defendant] has exhausted his administrative remedies for

burden of establishing that "extraordinary and compelling reasons warrant such a reduction." *Id.* § 3582(c)(1)(A)(i); *United States v. Newton*, 996 F.3d 485, 488 (7th Cir. 2021) (citing *United States v. Melgarejo*, 830 F.App'x 776, 778 (7th Cir. 2020)). A reduction must also be "consistent with applicable policy statements issued by the [U.S.] Sentencing Commission" (the "Commission"). 18 U.S.C. § 3582(c)(1)(A); *see United States v. Black*, No. 05 CR 70-4, 2024 U.S. Dist. LEXIS 20084, 2024 WL 449940, at *4 (N.D. Ill. Feb. 6, 2024) ("Congress directed the . . . Commission, in policy statements, to 'describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples.'") (quoting 28 U.S.C. § 994(t)).

In 2020, the Seventh Circuit held that the relevant policy statement, U.S.S.G. § 1B1.13, was inapplicable to prisoner-initiated motions for compassionate release. *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020) ("Section 1B1.13 addresses motions and determinations of the Director, not motions by prisoners. In other words, the . . . Commission has not yet issued a policy statement 'applicable' to [a prisoner's] request."). Therefore, because there was no applicable policy statement, the Seventh Circuit explained that courts have discretion when determining what constitutes an "extraordinary and compelling" reason warranting compassionate release. *Id.* ("[T]he trailing paragraph of § 3582(c)(1)(A) does not curtail a district judge's discretion. Any decision is 'consistent with' a nonexistent policy statement.").

---

the purposes of his current motion."); *see also* ECF No. 79-1 (Defendant's request for reduction in sentence to the BOP).

However, November 2023 amendments to § 1B1.13 clarify that, in addition to "expand[ing] the list of specified extraordinary and compelling reasons that can warrant sentence reductions,"[3] "the applicability of the policy statement [is extended] to defendant-filed motions . . . ." U.S. SENT'G COMM'N, AMENDMENTS TO THE SENTENCING GUIDELINES, POLICY STATEMENTS, OFFICIAL COMMENTARY, AND STATUTORY INDEX 7, https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf [https://perma.cc/P7TS-LMXQ] (last visited Dec. 3, 2024). Thus, it appears that the Seventh Circuit's prior determination of inapplicability of the policy statement to prisoner-initiated motions will change. *See United States v. Thacker*, 4 F.4th 569, 573 (7th Cir. 2021) ("[U]*ntil* the . . . Commission updates its policy statement to reflect prisoner-initiated compassionate release motions, district courts have broad discretion to determine what else may constitute 'extraordinary

---

[3]The relevant policy statement now describes extraordinary and compelling reasons to include "medical circumstances," which encompass (1) "terminal illness[es];" (2) "a serious physical or medical condition," "serious functional or cognitive impairment," or "deteriorating physical or mental health because of the aging process" that "substantially diminishes the ability of the defendant to provide self-care within . . . a correctional facility and from which he or she is not expected to recover"; (3) "medical condition[s] that require[] long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; and (4) the circumstance of being "housed at a correctional facility affected or at imminent risk of being affected by . . . an ongoing outbreak of infectious disease" or "public health emergency" which "cannot be adequately mitigated in a timely manner" and to which, "due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure." U.S.S.G. § 1B1.13(b)(1)(A)–(D). "Extraordinary and compelling" reasons can also include "any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons [specifically enumerated in § 1B1.13(b)], are similar in gravity." *Id.* § 1B1.13(b)(5).

and compelling reasons' warranting a sentence reduction.") (citing *Gunn*, 980 F.3d at 1180–81) (emphasis added).

Nonetheless, the distinction is ultimately academic. Courts retain discretion under the "catchall" provision of § 1B1.13 to find "any other circumstance or combination of circumstances" that are "similar in gravity" to those specifically enumerated in § 1B1.13 to be extraordinary and compelling bases for release. AMENDMENTS TO THE SENTENCING GUIDELINES, *supra* at 3, 10 (referring to U.S.S.G. § 1B1.13(b)(5) as a "catchall" provision); *cf. Gunn*, 980 F.3d at 1180 (holding, prior to November 1, 2023 amendments, that "[t]he substantive aspects of the . . . Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused") (citing *Gall v. United States*, 552 U.S. 38, 49–50 (2007) and *Kimbrough v. United States*, 552 U.S. 85 (2007)).

Prior to modifying a term of imprisonment, the Court must also consider the sentencing factors set forth in 18 U.S.C. § 3553(a), if applicable. 18 U.S.C. § 3582(c)(1)(A). The § 3553(a) factors include each of the following: the nature and circumstances of the offense; the defendant's history and characteristics; and the need for the sentence to (1) reflect the seriousness of the offense promote respect for the law, and provide just punishment, (2) afford adequate deterrence, (3) protect the public, and (4) provide the defendant with effective training, care, and/or treatment. *Id.* § 3553(a).

4. **ANALYSIS**

    4.1    **Extraordinary and Compelling Reasons**

As grounds for his motion, Defendant asserts two grounds constitute extraordinary and compelling reasons for compassionate release:

(1) the threat of contracting COVID-19 while incarcerated and (2) inadequate medical treatment he alleges he experienced upon arrival at FMC Butner. ECF No. 72 at 1–3. He also identifies the conditions denoted in U.S.S.G. § 1B1.13(a)(1)(B), which authorizes compassionate release of defendants over seventy years old who have served at least thirty years in prison, as an alternative ground for his release. *Id.* at 5. Finally, Defendant cites Amendment 821 to the Guidelines, which among other changes amended the use of "status points" for determining Guidelines ranges, as an additional ground for reducing his sentence. *Id.* at 1; ECF No. 86 at 16.

### 4.1.1 Threat of COVID-19

Defendant first represents that the "unprecedented threat of COVID-19 and its Variants" constitutes "extraordinary risk to [his] health," noting that "there is an extraordinary high risk of accelerated transmission of the variants in hospitals like FMC Butner." ECF No. 72 at 1–2. He further contends that he is experiencing symptoms of "Long Covid" but does not describe these symptoms. *Id.* at 2. He acknowledges he has received a vaccination against COVID-19 and a booster shot. *Id.* at 2; ECF No. 86 at 2; *see also* ECF No. 86-2 at 18 (immunization record while at Kenosha County Jail), 26 (immunization records while at FMC Butner).

In a series of 2021 cases after the COVID-19 vaccine became widely available, the Seventh Circuit repeatedly ruled that a generalized risk of contracting COVID-19 cannot constitute an extraordinary or compelling reason for compassionate release. *United States v. Broadfield*, 5 F.4th 801, 803 (7th Cir. 2021) ("[F]or the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release"); *United States v. Ugbah*, 4 F.4th 595, 597 (7th Cir. 2021) (holding that prisoners who

have access to a vaccine cannot use the risk of COVID-19 to obtain compassionate release unless they can show they are medically unable to be vaccinated); *see also United States v. Barbee*, 25 F.4th 531, 533 (7th Cir. 2022) (citing *Broadfield* and *Ugbah* to conclude the argument of a vaccinated inmate regarding the risk of COVID-19 was "foreclosed"); *United States v. Simpson*, No. 1:19-CR-72-HAB, 2024 U.S. Dist. LEXIS 91675, 2024 WL 2316235, at *3–4 (N.D. Ind. May 22, 2024) (concluding that in *Broadfield*, "the Seventh Circuit all but eliminated COVID-19 as a basis for compassionate release").

The relevant Guideline regarding when public health emergencies amount to "extraordinary and compelling" circumstances justifying compassionate release creates a three-element framework. *See* U.S.S.G. § 1B1.13(b)(1)(D). First, the defendant must be "housed at a correctional facility affected or at imminent risk of being affected by either an ongoing "outbreak of infectious disease" or "public health emergency." *Id.* § 1B1.13(b)(1)(D)(i). Second, the defendant must be "at increased risk of suffering severe medical complications or death as a result of exposure" to the disease or emergency "due to personal health risk factors and custodial status." *Id.* § 1B1.13(b)(1)(D)(ii). Third, the risk must be unable to be "adequately mitigated in a timely manner." *Id.* § 1B1.13(b)(1)(D)(iii).

Defendant's argument fails to meet all three elements. First, record evidence does not show that FMC Butner is experiencing an outbreak of COVID-19, nor is at imminent risk of experiencing one. When briefing occurred, there were *no* active COVID-19 cases at the Butner Complex. ECF No. 72 at 2; ECF No. 79 at 6 (citing BOP COVID-19 statistics as of July 15, 2024). The latest data shows only two active cases. *See Inmate COVID-19 Data*, FED. BUREAU OF PRISONS, https://www.bop.gov/about/statistics/

statistics_inmate_covid19.jsp (last updated Oct. 9, 2024). Two cases cannot constitute an "ongoing outbreak." *See, e.g., United States v. David*, No. 22-20184, 2024 U.S. Dist. LEXIS 188334, at *16–17 (E.D. Mich. Oct. 16, 2024) (finding risk of contracting COVID-19 was not an extraordinary or compelling reason where there were only two active cases at Butner); *Muhammad v. United States*, No. 4:13-CR-072(3), 2024 U.S. Dist. LEXIS 112369, 2024 WL 3166889, at *9 (E.D. Va. June 24, 2024) (finding no COVID-19 outbreak at Butner with only one active case). Nor is the Butner Complex at imminent risk of a COVID-19 outbreak.[4] Approximately two-thirds of Butner inmates are now vaccinated. *See Inmate COVID-19 Data*, FED. BUREAU OF PRISONS, https://www.bop.gov/about/statistics/

---

[4]To be sure, the Butner Complex, which has fifth largest inmate population among federal facilities, has had more COVID-related deaths than any other facility. *See Inmate COVID-19 Data*, FED. BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last updated Oct. 9, 2024) (noting 40 COVID-related deaths). Defendant's submissions include excerpts of an NPR article, which notes that "[m]ore deaths at Butner are to be expected. The complex includes a federal medical center (FMC) which is essentially a prison hospital. Inmates who need intensive medical care often end up at one of these hospitals . . . ." *See* ECF No. 72-1 at 1–16 and ECF No. 86-2 at 2–17 (citing Meg Anderson, *1 in 4 Inmate Deaths Happens in the Same Federal Prison. Why?*, NPR (Sept. 23, 2023, 6:00 AM), https://www.npr.org/2023/09/23/1200626103/federal-prison-deaths-butner-medical-center-sick-inmates [https://perma.cc/JQ3N-6Q2N]).

According to a Department of Justice inspection, the "most serious" surge in cases occurred "between June and mid-July [2020] and began to diminish in intensity thereafter." DEP'T OF JUST., NO. 21-031, REMOTE INSPECTION OF FEDERAL CORRECTIONAL COMPLEX BUTNER iii–iv (2021), https://oig.justice.gov/reports/remote-inspection-federal-correctional-complex-butner [https://perma.cc/5X46-KU89]. The majority of COVID-19 related deaths at the Complex (twenty-six of forty) occurred prior to July 25, 2020—five months before the COVID-19 vaccine became widely available. *Id.*; *see also* Peter Loftus & Melanie Grayce West, *First Covid-19 Vaccine Given to U.S. Public*, WALL ST. J. (Dec. 14, 2020, 11:17 PM), https://www.wsj.com/articles/covid-19-vaccinations-in-the-u-s-slated-to-begin-monday-11607941806.

statistics_inmate_covid19.jsp (last updated Oct. 9, 2024). Furthermore, in April 2023, the federal government ended the national state of emergency to respond to COVID-19. National Emergencies Act, Pub. L. No. 118-3, 127 Stat. 6 (2023).

Defendant's argument also fails to meet the second element. The Guidelines state that the Defendant must face an increased risk due to both "personal health risk factors *and* custodial status." *Id.* § 1B1.13(b)(1)(D)(ii) (emphasis added). Beyond a conclusory statement in his reply that his "medical condition individually heightens [his] susceptibility to COVID-19," ECF No. 86 at 12, Defendant's motion and reply focus entirely on arguing that his increased risk is due to his custodial status, but do not establish that he faces a particularized risk different from any of his fellow inmates "due to personal health risk factors." U.S.S.G. § 1B1.13(b)(1)(D)(ii); *see* ECF No. 72 at 1–3; ECF No. 86 at 1–2, 12; *see also United States v. Alexander*, No. 23-3395, 2024 U.S. App. LEXIS 12968, 2024 WL 2763814, at *7 (7th Cir. May 30, 2024) (affirming denial of compassionate release where the defendant did "not contend that he is unable to receive or benefit from the updated vaccines," nor that "he is at a higher risk of an adverse outcome in prison than out" (citing *United States v. Vaughn*, 62 F.4th 1071, 1072 (7th Cir. 2023) and *Barbee*, 25 F.4th at 533)). Nor do his medical records remedy this deficiency. Rather, they make clear that he has been vaccinated. ECF No. 86 at 26; *see also* ECF No. 79-2 at 90 (email from Defendant stating: "I would like to take the Covid Booster shot"). This fact alone forecloses the possibility of compassionate release in light of COVID-19. *Broadfield*, 5 F.4th at 803.

Finally, Defendant has not shown that, in the event of a serious outbreak, FMC Butner would be unable to "adequately mitigate[]" the

spread "in a timely manner." U.S.S.G. § 1B1.13(b)(1)(D)(iii). Defendant's anecdotal description of what occurs when an inmate tests positive for COVID-19 in his unit suggests that FMC Butner is capable of timely mitigating the spread. In Defendant's own words, COVID-positive inmates are kept "in their cells and isolated until they test negative. On the doors of the inmates who tested positive are caution signs. Outside of those doors are also carts with gloved, protective gowns, and mask [sic]." ECF No. 86 at 14. With two-thirds of inmates vaccinated, Butner's high vaccination rate is particularly notable considering it has the fifth largest inmate population among federal facilities. *See Inmate COVID-19 Data*, FED. BUREAU OF PRISONS, https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last updated Oct. 9, 2024). This demonstrates the facility can manage serious public health emergencies effectively.

Because Defendant "is vaccinated against COVID-19 . . . and is incarcerated at a facility with only two active COVID-19 cases," his concern regarding the virus does not constitute an extraordinary and compelling reason for his release.[5] *United States v. Morales*, No. 19-279, 2021 U.S. Dist. LEXIS 182096, 2021 WL 4324560, at *6–7 (D. Minn. Sept. 23, 2021); *see also Broadfield*, 5 F.4th at 803; *Ugbah*, 4 F.4th at 597; *Barbee*, 25 F.4th at 533.

---

[5]Both Defendant and the Government mention in briefing that Defendant has had COVID-19 once. ECF No. 72 at 2; ECF No. 79 at 6–7. The Court was unable to substantiate this in the medical information submitted. Defendant claims now to be suffering from "Long COVID" symptoms, for which the most common symptoms are "[f]atigue, brain fog, and post-exertional malaise (PEM)." *Signs and Symptoms of Long COVID*, CDC (July 11, 2024), https://www.cdc.gov/covid/long-term-effects/long-covid-signs-symptoms.html [https://perma.cc/U62G-2KSW]. However, beyond Defendant's conclusory statements in his filings, his medical records indicate no signs of Long COVID. The Court is constrained to "base [its] factual conclusions on record evidence; [it] cannot render unsupported medical opinions." *Newton*, 996 F.3d at 490.

### 4.1.2 Alleged Inadequate Medical Treatment

Defendant next represents that, when he first arrived at the Butner Complex in 2021, he was denied access to antibiotic medication and was not provided "a wheelchair, walker, or cain [sic]." ECF No. 72 at 3. Defendant states that he subsequently received a cane from his physical therapist, but alleges that a doctor refused to provide him with antibiotics for "several months." *Id.* He claims these acts were "deliberat[e] and malicious[]" and ultimately resulted in "acute kidney failure" as well as "chronic multifocal osteomyelitis" (bone infection) in his right tibia, requiring surgery at Duke University Medical Center. *Id.* at 3, 6. He argues these circumstances constitute an extraordinary and compelling reason for compassionate release.

By arguing that his medical treatment was insufficient, Defendant appears to invoke language from two circumstances that the Guidelines identify as extraordinary and compelling reasons: (1) when the Defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" or (2) when "[t]he Defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death." U.S.S.G. § 1B1.13(b)(1)(B)–(C).

The Court is constrained to "base [its] factual conclusions on record evidence; [it] cannot render unsupported medical opinions." *Newton*, 996 F.3d at 490. In reviewing Defendant's medical records, the Court believes that his account of his medical treatment at the Butner Complex leaves out significant context. To begin, his osteomyelitis is not new; since 2008, he has

been in and out of hospitals due to "chronic pain and recurring infections in his right leg," ECF No. 59, ¶¶ 147–49, requiring seven surgeries. ECF No. 79-2 at 9. On multiple occasions, he failed to complete antibiotic treatment and requested to be discharged from the hospital against medical advice. ECF No. 59, ¶¶ 147–49. In addition, prior to incarceration, multiple doctors recommended he have his leg amputated due to the recurring bone infections, but he continually refused and chose instead to undergo other surgical procedures. *Id.* ¶¶ 146, 148, 151. Prior to arriving at the Butner Complex, he had never participated in any formal physical rehabilitation. ECF No. 79-2 at 9. His health conditions—particularly his leg injury—were known to the Court at the time of sentencing, and the Court therefore recommended that he be placed at a federal medical facility. *See* ECF No. 57 at 3.

Upon arrival to Butner II in August 2021, he was seen by medical staff and prescribed Gabapentin for nerve pain. ECF No. 79-2 at 23. His records indicate that he was not prescribed an antibiotic, but no signs of an infection were detected before or after quarantine. *Id.* at 23, 45. Upon completion of quarantine, he was seen again by doctors, who requested an evaluation "for [an] appropriate assistive device and alternative shoes if appropriate" and to determine his "ability to ambulate 1 flight of stairs." *Id.* at 45. On October 5, 2021, he was issued a cane. *Id.* at 10. Two of his comments to his physical therapist are notable. First, he informed them that he had used a wheelchair for two years, but did *not* want to go back to using one. *Id.* at 9. Second, when discussing the fact that his cell was upstairs, he indicated he "like[d] doing the stairs because he want[ed] to get stronger." *Id.* at 10. In the remaining months of 2021 and 2022, he attended physical therapy sixteen times. *Id.* at 66–68. Defendant's comments and this medical

Page 12 of 20
Case 2:19-cr-00236-JPS   Filed 12/03/24   Page 12 of 20   Document 88

history cast doubt on Defendant's claim that his doctor at Butner "deliberat[e]ly and maliciously caused [him] serious injury." ECF No. 72 at 6.

On March 18, 2023, Defendant reported pain in his leg and was seen by a doctor, who noted that "[n]o signs of active injury or infection [were] visible," but that Defendant's records prior to his arrival at the Butner Complex stated that "he should be evaluated for life long antibiotic suppression for osteomyelitis." ECF No. 79-3 at 296. Two days later, he was evaluated again and prescribed antibiotic medication. *Id.* at 293. On March 23, swelling began and when tests came back the next day, it was determined he "may be experiencing an AKI [acute kidney infection] related to the current infection in his right lower leg." *Id.* at 279, 281. The doctors discussed the plan to transfer Defendant to an outside hospital with him and informed Defendant that he will "most likely need amputation of the right lower leg," to which he "replied that he will not be having his leg amputated while he is in prison." *Id.* at 276–77.

At Duke Regional Hospital, Defendant underwent multiple surgeries to treat his osteomyelitis. He was then transferred to FMC Butner and prescribed several medications to prevent infection and relieve pain. *See id.* at 264; ECF No. 86 at 7. He was seen every day for the subsequent months of April and May 2023. ECF No. 79-3 at 370–88. As of June 2024, Defendant "ambulates with a walker and sometimes independently," and "has a wheelchair that he utilizes when needed." ECF 79-4 at 32. His latest record indicates that he "continues to do well." *Id.* at 1; *see also id.* at 11 ("feels gen well & has no complaints" on June 21, 2024); 19 ("reports feeling gen well" on June 20, 2024); 27 ("all in all feeling well" on June 17, 2024).

The Court concludes that Defendant has not met his burden to establish that his medical conditions constitute an extraordinary or compelling reason for release. *Newton*, 996 F.3d at 488. He has not shown that "medical care . . . is not being provided," U.S.S.G. § 1B1.13(b)(1)(C), nor that his ability to "provide self-care" at Butner is "substantially diminishe[d]," *id.* § 1B1.13(b)(1)(B). Rather, when signs of an infection appeared, he was immediately seen twice by doctors and then transferred to an outside hospital; upon his return, he has received around-the-clock care and assistance and "continues to do well." ECF 79-4 at 1.

Defendant also argues that he should "be released into an enviro[n]ment where he and his loved ones can control [and] direct his medical care." ECF No. 72 at 5. However, "a common sense reading of the compassionate release statute compels the obvious: compassionate release due to medical conditions, alone or in combination with the COVID-19 pandemic, makes little sense if the defendant would not in fact receive better medical care outside of prison." *United States v. Miller*, No. 97-CR-98-13-JPS, 2022 U.S. Dist. LEXIS 25678, 2022 WL 444557, at *15 (E.D. Wis. Feb. 14, 2022) (quoting *United States v. Marquez*, No. 1:13-CR-00431, 2021 U.S. Dist. LEXIS 35647, at *1 (E.D. Cal. Feb. 25, 2021)). Defendant has not sufficiently argued or evidenced "that he will receive better care outside of a custodial sentence." *Id.* at *15–16 (citing *United States v. Vasser*, No. 8:17-CR-276, 2021 U.S. Dist. LEXIS 42108, 2021 WL 736294, at *2 (D. Neb. Mar. 4, 2021)). Instead, when out of custody, Defendant repeatedly disregarded medical advice, discharged himself early from the hospital, and continued to rack up injuries that exacerbated the ones he already had. ECF No. 59, ¶¶ 146–51. For these reasons, the Court does not find that the medical

circumstances of the defendant constitute an extraordinary or compelling reason for compassionate release under U.S.S.G. § 1B1.13(b)(1).

### 4.2 § 1B1.13(a)(1)(B) Circumstances

In his motion for compassionate release, Defendant also makes passing reference to the circumstances described in U.S.S.G. § 1B1.13(a)(1)(B) as alternative grounds for reduction of his term of imprisonment. ECF No. 72 at 5. These allow the Court to reduce a sentence when the defendant "(i) is at least 70 years old; and (ii) had served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned." U.S.S.G. § 1B1.13(a)(1)(B). Because he is forty-one and has not served thirty years in prison (nor is he even serving a thirty-year sentence), Defendant meets neither of these requirements. As a result, the Court cannot reduce his sentence under § 1B1.13(a)(1)(B).

### 4.3 Amendment 821

The Court may also modify a sentence when the sentencing range used when sentencing a Defendant "has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2). In April 2023, the Commission promulgated Amendment 821, which amended procedures for determining sentencing guideline ranges. *Materials Relating to the 2023 Criminal History Amendment*, U.S. SENT'G COMM'N, https://www.ussc.gov/policymaking/materials-relating-2023-criminal-history-amendment [https://perma.cc/T954-GQFK] (last visited Dec. 3, 2024). "Part A of the amendment decreases 'status points' by one point for individuals with seven or more criminal history points and eliminates them for those with six or less criminal history points." *Id.* (under "Who is Eligible for Retroactive Application?" heading). In August 2023, the Commission voted

to give retroactive effect to this portion of Amendment 821. *Id.* The Amendment took effect on November 1, 2023. *Id.*

The commentary to U.S.S.G. §1B1.10 (the relevant policy statement for Amendment 821) clarifies that a reduction "is not authorized under . . . § 3582(c)(2) and is not consistent with this policy statement if . . . the amendment does not have the effect of lowering the defendant's applicable guideline range because of the operation of another guideline or statutory provision"—for example, "a statutory mandatory minimum term of imprisonment." U.S.S.G. § 1B1.10 Commentary, Application Notes 1(A). Additionally, "the court shall not reduce the defendant's term of imprisonment . . . to a term that is less than the minimum of the amended guideline range" determined after application of any relevant amendment(s). U.S.S.G. § 1B1.10(b)(2)(A).

While Defendant mentions Amendment 821 in his reply and argues that he is entitled to a sentence reduction, he is not. ECF No. 86 at 16. Two of the counts to which he pled guilty came with mandatory minimum sentences totaling 168 months (two consecutive 84-month sentences); Amendment 821 would not change the fact that he is subject to these mandatory minimums. U.S.S.G. § 1B1.10 Commentary, Application Notes 1(A). The remaining three counts had a Guidelines range of imprisonment of 121 to 151 months prior to Amendment 821. *See* ECF No. 59, ¶¶ 103–04, 171; U.S.S.G. § 5A (Sentencing Table). Amendment 821's reduction of his Criminal History Points by one point would change his Criminal History Category from IV to III, which in combination with his unchanged offense level of 29, ECF No. 55 at 1, would reduce the Guidelines range of imprisonment for these counts to 108 to 135 months. U.S.S.G. § 5A. However, for these three counts, Defendant was sentenced to *one day* of

imprisonment. ECF No. 57 at 3. Thus, considering that the imposed sentence for the counts subject Amendment 821's changes was already well below the Guidelines range, the Court cannot reduce his term of imprisonment to an even shorter sentence below the new range. U.S.S.G. § 1B1.10(b)(2)(A).

### 4.4 The § 3553(a) Factors

Having determined that Defendant has not presented an extraordinary and compelling reason warranting release, the Court is not required to consider the § 3553(a) factors. *See Thacker*, 4 F.4th at 576 ("*Upon a finding* that the prisoner has supplied [an "extraordinary and compelling"] reason, the second step of the analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in § 3553(a) . . . .") (emphasis added). However, even if Defendant had demonstrated an extraordinary or compelling reason, the Court's application of the sentencing factors to Defendant counsel against early release.

The § 3553(a) factors consider both "the nature and circumstances of the offense" as well as Defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1). Additional factors look to whether the sentence imposed (1) "reflect[s] the seriousness of the offense," (2) "promote[s] respect for the law," (3) "provide[s] just punishment," (4) "afford[s] adequate deterrence to criminal conduct," (5) "protect[s] the public from further crimes of the defendant; and" (6) "provides the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2)(A)–(D).

In this case, Defendant pled guilty to three cell phone store robberies. ECF No. 59, ¶ 15. For two of them, he was armed with a firearm. *Id.* The

Page 17 of 20
Case 2:19-cr-00236-JPS    Filed 12/03/24    Page 17 of 20    Document 88

robberies were almost identical: Defendant ordered employees and customers into a back room at gunpoint, made threats to shoot them, and forced them to lay on the ground while Defendant and his coconspirator loaded the cell phones into garbage bags. *Id.* ¶ 16. The stolen merchandise was valued at $66,164. *Id.* ¶¶ 48–49. After fleeing one of the robberies and engaging in a car chase with police, Defendant was apprehended when the car crashed through a gate, almost struck a pedestrian, and crashed into a tree, causing Defendant to fracture his right tibia. *Id.* ¶¶ 52, 153. The nature of these offenses—which put multiple people at risk of significant harm— is undoubtedly serious. 18 U.S.C. § 3553(a)(1), (a)(2)(A). Because the imposed sentence reflects this serious nature, provides appropriate punishment, and seeks to protect the public, the circumstances of the offense do not weigh in favor of early release. 18 U.S.C. § 3553(a)(2)(A), (C).

As for his personal and criminal history, Defendant was raised by his grandmother alongside his nine siblings in Chicago. *Id.* ¶¶ 132–36. At age twelve, he joined a street gang and was introduced to selling drugs. *Id.* ¶ 137. He stopped affiliating with the gang after he was injured in multiple shootings and became a father. *Id.* ¶ 137. He is the father of two children. *Id.* ¶ 140. Although Defendant accepted responsibility and expressed regret for his actions, *id.* ¶¶ 53–54, the underlying offense was just the latest in a lifelong criminal history, which includes juvenile offenses. *Id.* ¶ 92–94. As an adult, he has eight convictions, including one for possession of heroin, two DUI convictions, and one for the use of a counterfeit currency. *Id.* ¶¶ 95–102. The presentencing report also identifies twenty-two other arrests. *See id.* ¶¶ 109–30. Defendant's criminal history reflects a consistent disregard of and disrespect for the law, as well as for the property and well-being of others. His current sentence, therefore, is necessary to "promote

respect for the law" and "protect the public from further crimes." 18 U.S.C. § 3553(a)(2)(A), (C).

Defendant explains that he has received "NO disciplinary infractions while in custody" and has completed "the mandatory drug progream [sic] and other programs that speak to his character and growth." ECF No. 72 at 6. He has not provided any documentation to substantiate this assertion. Even if he had, it would not change the Court's analysis. Countervailing these improvements is the fact that Defendant is serving a sentence for violent crimes—three robberies, in the majority of which he brandished a firearm and threatened the lives of others. Releasing Defendant now, when he has completed just over three years of his fourteen-year sentence, would not promote—and indeed would undermine—the goals of deterrence and protection of the public. *See* 18 U.S.C. § 3553(a)(2)(B)–(C). Furthermore, when considering the medical care Defendant is currently receiving at the federal medical center in conjunction with Defendant's history of ignoring medical advice, early release would undermine the goal of continued rehabilitation. *See id.* § 3553(a)(2)(D). Having considered the applicable § 3553(a) factors, the Court remains unconvinced that compassionate release is appropriate for Defendant.

5.  **CONCLUSION**

Because Defendant has not demonstrated an extraordinary and compelling reason warranting compassionate release, U.S.S.G. § 1B1.13(a)(1)(B) is inapplicable, Amendment 821 does not allow for a reduction of Defendant's sentence, and the § 3553(a) factors do not support release at this juncture, the Court will deny Defendant's motion for compassionate release. Because the Court can resolve the motion on the parties' written submissions without further aid of counsel, it will also deny

as moot Defendant's motions for a video conference hearing, ECF No. 73, and for appointment of counsel, ECF No. 74.

Accordingly,

**IT IS ORDERED** that Defendant Richard Tolbert's motion for compassionate release, ECF No. 72, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendant Richard Tolbert's motion for video conference hearing, ECF No. 73, be and the same is hereby **DENIED as moot**;

**IT IS FURTHER ORDERED** that Defendant Richard Tolbert's motion for appointment of counsel, ECF No. 74, be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that the United States's motion to seal its submission, ECF No. 78, be and the same is hereby **GRANTED**; the documents at ECF No. 79 shall remain under seal until further order of the Court.

Dated at Milwaukee, Wisconsin, this 3rd day of December, 2024.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge